Richard Petersen-Klein Executive Director Kansas Racing and Gaming Commission
700 SW Harrison St., Suite 500 Topeka, KS 66603
Dear Mr. Petersen-Klein:
In your capacity as the Executive Director of the Kansas Racing and Gaming Commission (KRGC), you ask us to opine on two issues:
 1. Whether the Kansas Expanded Lottery Act (KELA) prohibits only employees and contractors of casinos from loaning money or extending credit to patrons; and
 2. Whether certain check-cashing services would be a form of loan or extension of credit to a casino patron.
We address each of these issues in turn.
 Manager vs. Manager's Employees
You inquire whether, in our opinion, the KELA prohibits lotterygaming facility managers from loaning money or otherwise extending credit to patrons, or only prohibits the managers' employees, contractors and legal affiliates from doing so. K.S.A. 2010 Supp. 74-8756(c) states, "No employee or contractor of, orother person who has any legal affiliation with, a lottery gamingfacility manager shall loan money to or otherwise extend credit to patrons of a lottery gaming facility."[1]
The KELA defines "lottery gaming facility manager" as "a corporation, limited liability company, resident Kansas American Indian tribe or other business entity" which is authorized to construct and manage, or manage alone, a lottery gaming facility pursuant to a contract with the Kansas Lottery Commission; in other words, a casino.[2] Violation of K.S.A. 2010 Supp. 74-8756(c) is a class A nonperson misdemeanor for a first conviction, and a severity level 9 nonperson felony for a second and subsequent conviction.
To answer your question, we must consider two rules of statutory construction. First, we note that when the language of a statute is clear and unambiguous, the plain meaning of the language is conclusive.[3] If we examine K.S.A. 2010 Supp. 74-8756(c) from the viewpoint of this rule, the clear and unambiguous language prohibits only a casino employee, contractor, and/or person who hasany legal affiliation from loaning money or extending credit to a casino patron. Thus, a strict application of this rule would have the result that a casino could loan money or extend credit to its patrons, but the casino's employees, contractors and legal affiliates could not.
However, courts consider legislative intent in cases in which literal application of a statute produces a result demonstrably at odds with the intention of the drafters.[4] Courts will not assume that the Legislature intended to exclude specific terms in a statute when such an interpretation would defeat a clearly contrary legislative intention.[5] We do not believe that K.S.A. 2010 Supp. 74-8756(c) was intended only to prevent the employees, contractors and legal affiliates of a casino from extending loans or credit. Such an interpretation would be at odds with other state statutes and tribal gaming compacts
prohibiting the use of loans or lines of credit for gaming.[6] It is our opinion that this statute is intended to have the same effect as other Kansas statutes and compacts prohibiting gaming on loan or credit cards, i.e., to prevent any form of gambling on borrowed money. Allowing a casino to loan money or extend credit to patrons would frustrate that intent.
We must also consider a second rule of statutory construction, that statutes must be construed to avoid unreasonable results.[7] A casino is a business entity, and generally can only act through its agents and employees. A casino would not be able to loan money or extend credit to a patron without an employee, contractor or legal affiliate to execute necessary actions, such as approving the loan or delivering cash to the patron. Even if the casino were to create a method by which such loan or extension of credit could be accomplished electronically, such as through an automated kiosk, the manager's employees, contractors and/or legal affiliates would still be required to assist in designing, purchasing and helping patrons to operate the kiosk. In short, the casino could not take advantage of an exemption from K.S.A. 2010 Supp. 74-8756(c) without its employees, contractors and/or legal affiliates engaging in behavior that could subject them to criminal charges. In our opinion, it is unreasonable to conclude that a casino — but not its employees, contractors and/or legal affiliates — is exempt from this statute.
 Check-cashing Services
In your letter, you ask about the legality of check-cashing programs similar to the "VIP Preferred Check Cashing" (VIP Preferred) program offered through Global Payments Gaming Services, Inc. (GPGS), a wholly-owned subsidiary of Global Payments, Inc. (GPI). Specifically, you ask whether such services would be considered a loan or extension of credit to casino patrons in violation of the KELA.
The KELA does not define "loan" or "credit." In the absence of a definition of "loan" in the KELA, [8] we may consider the plain language definition: "a grant of something for temporary use."[9]
The Kansas Consumer Credit Act ("the Act") defines "credit card" as "any card . . . that may be used from time to time to obtain credit."[10] Finally, the Act defines "credit" as: "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[11]
We base our opinion on the uncontested facts about the program presented in your letter, GPI's informational materials regarding the VIP program and letters submitted by counsel.[12] Based upon the information presented to us about VIP Preferred, the program operates as follows: GPGS guarantees checks cashed at a casino by patrons approved for the program, in exchange for a fee paid by the casino to GPGS for each check cashed.[13] A casino patron approved to participate in the VIP Preferred program may cash paper and electronic checks ("e-checks") at the casino upon presentment of the patron's VIP Preferred membership card. The VIP Preferred Card may be used to cash e-checks, whereby the casino processes the VIP card and issues cash to the patron. In an e-check transaction, the patron signs a receipt assigning GPGS the right to collect on the e-check, [14] and GPGS transfers funds to the casino to cover the amount of the e-check at the same time GPGS debits the patron's checking account. If an e-check is returned for insufficient funds, GPGS suspends the patron's check-cashing privileges and initiates collection proceedings.
For paper check transactions, the patron presents a blank check to the casino cashier, who processes the check for the amount ordered by the patron. The paper check is made payable to the casino, and the casino deposits the check. If a paper check is returned for insufficient funds, the casino assigns the returned check to GPGS for collection, in exchange for which GPGS pays the casino the amount of the returned check. GPGS then initiates collection proceedings against the VIP Preferred patron. GPGS charges the patron a fee for returned checks.[15]
At no time does GPGS allow a VIP Preferred patron to defer payment of a paper check or e-check. As a condition of membership in the VIP Preferred program, patrons must agree to pay GPGS the amount of a returned paper or e-check, plus a returned check fee.
KRGC regulations allow casinos to cash patrons' personal checks so long as certain internal controls are in place and the checks are processed through ordinary banking channels.[16] By regulation, the KRGC requires casinos to verify personal checks equaling or exceeding $500.00, and specifically permits the use of a "check verification and warranty service" such as GPGS.[17] We note that these regulations are presumed to be valid, [18] and no party submitting information in regard to this opinion has suggested that such regulations conflict with the KELA. As such, we opine that if GPGS' VIP Preferred program for paper checks complies with KRGC regulations, then it is allowable under the KELA.
In your letter, you state that the KRGC's primary concern is related to the e-check guarantee service offered by GPGS, and whether certain features of the VIP Preferred Card render it a "credit card" under Kansas law. The specific features of the VIP Preferred e-check program of concern to the KRGC are: (1) e-checks do not automatically transfer funds from the patron's checking account, meaning that the patron may not have sufficient funds to cover the e-check; (2) a memo noting the e-check transaction is posted to the patron's checking account, but the funds are normally debited two to three days later; (3) patrons utilizing the e-check service do not enter a PIN to debit their checking account, but instead sign a receipt authorizing GPGS to debit their checking account;[19] and (4) the VIP Preferred program offers a "revolving eight-day check cashing limit" for both paper and e-checks. The "revolving eight-day check cashing limit", which is determined by GPGS for each VIP Preferred member, allows the member to cash checks over an eight-day period up to his or her individual limit. As checks clear, the dollar amount of those checks is added back to the available limit for future use.[20]
We first consider whether a VIP Preferred card used to cash e-checks is a credit card or a debit card. There are two forms of debit cards: cards that authorize transactions through the user's personal identification number (PIN), and cards that require the user's signature to authorize the transaction.[21] Both types of debit card transactions draw funds from the user's checking account, but PIN-based debit transactions clear more quickly because authorization and clearing information is transmitted in a single message, whereas signature-based debit transactions require two messages to clear.[22] GPGS describes the difference between the two debit systems as follows:
 Debit card payments differ slightly from traditional credit card transactions in that the cardholder is required to have sufficient funds available in a deposit account at the time of the transaction, or the debit card transaction will not be authorized. PIN-based debit transactions are sent through a debit network while signature-based debit or check card transactions, which are offered exclusively in the United States, are sent through Visa and MasterCard and require a signature at the time of purchase. Also, PIN-based debit transactions typically deduct the purchase amount from the cardholder's deposit account within a day of the purchase, depending on the time of the purchase. Signature-based debit, or check card transactions typically debit the cardholder's deposit account two to three days after the purchase, although the funds are "held" with a memo posted to the cardholder's bank account.[23]
A key feature of any debit card transaction is that it triggers a transfer of funds from the patron's checking account. For example, if a customer purchases groceries using a PIN debit card, the PIN authentication network will debit funds from the customer's checking account immediately. If the same customer purchases groceries using a signature debit card, the signature debit authentication network will post a memo to the customer's checking account to hold funds for the transaction, but the debit transaction will not fully clear the customer's account for two to three days. In this way, signature debit cards function much like a paper check, in that funds are drawn on a checking account, but the debit does not occur immediately. However, at no time may a signature debit card user defer payment of a debit, and for this reason a signature debit card is not a credit card under the Act. We would not consider either a paper check or a signature debit transaction to be a form of loan or credit, but rather a payment from the customer's checking account that requires some time to clear through ordinary banking channels.
Likewise, a VIP Preferred e-check is authorized by the patron's signature, is drawn on the patron's checking account, posts a memo to the patron's checking account while the transaction is pending, and clears within two to three days. GPGS does not make payments on behalf of the patron or credit the patron's checking account in any manner. At no time may a VIP Preferred e-check user defer payment of an e-check; e-checks returned for insufficient funds result in collection proceedings.
Thus, based upon the description of the VIP Preferred e-check presented to us, the VIP Preferred e-check program appears to function as a signature debit card. For this reason, we opine that an e-check card that operates in the same manner as a signature debit card is not the equivalent of a credit card, and as such is not "credit" for the purposes of the KELA.
We further opine that a VIP Preferred e-check is not a "loan" for the purposes of the KELA. Based upon the facts presented to us, an e-check transaction does not fall within the Act's definition of "loan" because GPGS is not paying a debt owed by the patron, offering a cash advance pursuant to a credit card, or crediting the patron's account. An e-check also does not fit the plain language definition of "loan," because GPGS is not granting cash to the patron for temporary use. Thus, we do not believe that the Kansas Legislature intended the KELA to prohibit such e-check transactions.
The KRGC also expressed concern that "revolving eight-day check-cashing limit" offered by the VIP Preferred program is akin to a revolving credit limit set by a credit card, and therefore implies that the VIP Preferred e-check card operates like a credit card. For the reasons described above, we opine that, so long as the revolving limit does not meet the definition of "loan" or "credit" for the purposes of the KELA, then such a limit would not invalidate an otherwise lawful check-cashing service provided to casino patrons. Based upon the information presented to us, VIP Preferred e-checks always draw from funds in the patron's checking account, regardless of the patron's individual eight-day check-cashing limit. Thus, so long as GPGS's revolving check-cashing limit does not allow users to defer payment of cashed checks, and does not delay or interfere with ordinary signature debit transaction clearing processes, then the eight-day limit could be lawfully offered in Kansas casinos.
In conclusion, Kansas prohibits tribal gaming facilities and parimutuel racing licensees from loaning money or extending credit to patrons for the purpose of gambling. K.S.A. 2010 Supp. 74-8756(c) does not expressly prohibit a casino from loaning money or extending credit to patrons, but it is our opinion that a literal reading of that statute would frustrate the clear intent of the Kansas Legislature to prohibit loans or credit for the purpose of gaming. As such, we opine that K.S.A. 2010 Supp. 74-8756(c) should be read to prohibit a casinoand its employees, contractors and legal affiliates from loaning money or extending credit to casino patrons.
We further opine that a paper check authorization and guarantee service that complies with KRGC regulations is lawful under the KELA. Finally, we opine that an electronic check-cashing program that processes electronic checks in the same manner as a signature debit card is neither a loan nor a form of credit for the purposes of the KELA.
Sincerely,
Derek Schmidt Attorney General
Sarah Fertig Assistant Attorney General
[1] Emphasis added.
[2] K.S.A. 2010 Supp. 74-8702(o).
[3] National Union Fire Ins. Co. of Pittsburgh, Pa. v. MidlandBancor, Inc., 854 F.Supp. 782 (D. Kan. 1994).
[4] Id.
[5] Id.
[6] See K.S.A. 2010 Supp. 74-8819(f); Tribal State Gaming Compact Among the Iowa Tribe of Kansas and Nebraska and the State of Kansas, § 3(G), April 18, 1995; Tribal State Gaming Compact Between the Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas and the State of Kansas, § 3(G), May 12, 1995; Tribal State Gaming Compact Between the Prairie Band Potawatomi Nation in Kansas and the State of Kansas, § 3(G), April 20, 1995; Class III Gaming Compact Between the Sac and Fox Nation of Missouri in Kansas and Nebraska and the State of Kansas, § 3(G), April, 1995.
[7] Todd v. Kelly, 251 Kan. 512, 515 (1992).
[8] The Kansas Consumer Credit Act, defines "loan" as (i) The creation of debt by the lender's payment of or agreement to pay money to the debtor or to a third party for the account of the debtor; (ii) the creation of debt either pursuant to a lender credit card or by a cash advance to a debtor pursuant to a credit card other than a lender credit card; (iii) the creation of debt by a credit to an account with the lender upon which the debtor is entitled to draw immediately; or (iv) the forbearance of debt arising from a loan. K.S.A. 16a-1-301(27). The KELA does not adopt this definition of "loan," and as such we do not base our opinion upon this definition. If we applied the Kansas Consumer Credit Act's definition to this matter, our opinion might have a different outcome.
[9] Black's Law Dictionary (9th ed. 2009).
[10] K.S.A. 16a-1-301(19).
[11] K.S.A. 16a-1-301(18).
[12] Per K.S.A. 75-704, Attorney General Opinions address questions of law, not questions of fact.
[13] Global Payments, Inc., 2011 Annual Report, p. 7.
[14] Global Payments, Inc., VIP Preferred @dvantage® Card Enrollment, 2011.
[15] Id.
[16] K.A.R. 112-104-10. For the purposes of our analysis, the key provisions of this regulation are: (1) postdated checks are not permitted; (2) paper checks must be made payable to the casino; (3) gaming facilities may obtain verification of checks exceeding $500.00 from a check verification and warranty service certified as a vendor by the KRGC; (4) the casino may exchange cash for the personal check only in an amount equal to the amount for which the check is drawn; and (5) paper checks must be deposited by the next banking day following receipt.
[17] K.A.R. 112-104-10(c)(5).
[18] See, e.g., Peck v. University Residence Comm. of Kan. StateUniv., 248 Kan. 450 (1991).
[19] Global Payments, Inc., Check Cashing Has Never BeenEasier, 2010.
[20] Id.
[21] See, e.g., 76 Fed. Reg. 43,395 (July 20, 2011).
[22] Id.
[23] Global Payments, Inc., 2011 Annual Report at 5, accessed on November 8, 2011, at http://www.sec.gov/Archives/edgar/ data/1123360/000119312511196004/d10k.htm.
 *Page 1